**LAWYERS SURETY CORPORATION,**
Appellant,

v.

**RIVERBEND BANK, N.A., Appellee.**

No. 2-97-227-CV.

Court of Appeals of Texas,
Fort Worth.

March 26, 1998.

8. The Texas Rules of Appellate Procedure were amended effective September 1, 1997.

Sullivan, Ave & Holston, G. Dennis Sullivan, Dallas, for Appellant.

Malcolm G. Nichols, Arlington, for Appellee.

Before DAY, RICHARDS, and HOLMAN, JJ.

## OPINION

DAY, Justice.

In this case of first impression, we must determine whether a "floor plan" between a bank and a car dealer is within the scope of a statutory motor vehicle dealer's surety bond, so that the bank can recover on the bond if the dealer defaults on the floor plan. We hold that it is not. Accordingly, we reverse the trial court's judgment for appellee Riverbend Bank, N.A. (Riverbend) and render judgment for appellant Lawyers Surety Corporation (LSC).

### I. BACKGROUND FACTS

Swedish Imports, Inc. (Swedish) was a used car dealer. To receive and renew its dealer's license, Swedish was required to post a $25,000 bond. Swedish obtained a surety bond from LSC. The bonding statute requires that the surety bond must be conditioned on:

(A) the payment by the applicant of all valid bank drafts, including checks, drawn by the applicant to buy motor vehicles; and

(B) the transfer by the applicant of good title to each motor vehicle the applicant offers for sale.

TEX. TRANSP. CODE ANN. § 503.033(b)(2) (Vernon 1998).

Swedish was one of Riverbend's banking customers. Riverbend loaned Swedish $100,000 for its business operations through two $50,000 lines of credit. The first line of credit was a working capital loan secured by a $50,000 certificate of deposit. The second line of credit, known as a "floor plan," was secured by Swedish's automobile inventory.

Under the floor plan arrangement, Swedish would purchase a car from a wholesale dealer or other seller. Swedish would prepare and sign a bank draft payable to the seller for the purchase price of the car. The seller would then deposit the draft, the car title, and other sale documents at the seller's bank. The seller's bank would credit the seller's account for the draft amount and then forward the draft to Riverbend for payment. If the documents were in order and Swedish's line of credit was sufficient to cover the draft, Riverbend would pay it. Riverbend would then charge the draft amount against Swedish's line of credit. If the documents were not in order, or if Swedish had exhausted its line of credit, Riverbend would not pay the seller the draft amount. Both LSC and Riverbend agree that Riverbend paid the sellers the amounts of the bank drafts.

### A. The First Lawsuit

Swedish's lines of credit at Riverbend were evidenced by promissory notes. Riverbend renewed the notes several times. Swedish eventually defaulted on the notes, and Riverbend foreclosed on its collateral. Riverbend also filed suit against Swedish and its two principals, Joyce Grant and William Grant,[1] because the collateral was insufficient to cover the amount of the notes. The parties entered into a compromise and settlement agreement and presented the trial court with an agreed judgment. The agreed judgment recited in pertinent part:

1. The Court finds that defendant, Swedish Imports, Inc. is indebted to the plaintiff in the principal amount of $34,899.67 pursuant to its default in payment of that certain promissory note in favor of the plaintiff dated August 3, 1989.

2. The Court finds that during the period from May 19, 1988 through November 29, 1989, defendant, Swedish Imports, Inc. failed to pay valid bank drafts drawn by it on RiverBend Bank, N.A. for the purchase of motor vehicles, in the amount of $34,899.67.

The trial court signed the agreed judgment on July 27, 1992. LSC did not receive notice of the lawsuit and was not a party to it.

### B. The Second Lawsuit

Based on the agreed judgment's recital that Swedish had "failed to pay valid bank drafts," Riverbend demanded payment from LSC on the bond. When LSC denied coverage, Riverbend sued to recover on the bond. After a bench trial, the trial court rendered judgment for Riverbend. The trial court made the following conclusions of law:

- Riverbend had met all conditions precedent so that it could collect under the bond;

- The holding in the agreed judgment between Riverbend and Swedish that Swedish had failed to pay valid bank drafts was res judicata as between Riverbend and LSC;

- LSC had breached its contractual duty to Riverbend under the bond;

- LSC was liable to Riverbend for the full $25,000 amount of the bond; and

- Riverbend was not entitled to attorney's fees.

### II. ISSUES ON APPEAL

On appeal, LSC contends that:

---

**1.** Swedish's two principals were actually Jack Grant and William Grant. But Jack had died by the time of suit, so Riverbend sued his widow Joyce to recover from Jack's estate.

- it is not bound by res judicata to the agreed judgment's finding that Swedish had failed to pay all valid bank drafts drawn by it on Riverbend;

- Swedish's default on its floor plan financing did not render LSC liable on the bond; and

- the trial court's conclusions of law are not supported by its findings of fact or the evidence.

Riverbend asserts that the trial court's judgment is correct, except that Riverbend is entitled to recover attorney's fees from LSC.

### III. STATUTORY CONSTRUCTION

The bonding statute provides:

A person may recover against a surety bond ... if the person obtains against a person issued a motor vehicle dealer general distinguishing number ... a judgment assessing damages and reasonable attorney's fees based on an act or omission on which the bond is conditioned that occurred during the term for which the general distinguishing number was valid.

TEX. TRANSP. CODE ANN. § 503.033(d).

The two acts or omissions on which the surety bond was conditioned are set by statute: (1) Swedish's payment of all valid bank drafts that it drew to buy motor vehicles; and (2) Swedish's transfer of good title to each motor vehicle that it offered for sale. *See id.* § 503.033(b). Only the first condition is at issue here.

The agreed judgment between Riverbend and Swedish recites that Swedish "failed to pay valid bank drafts drawn by it on RiverBend Bank ... for the purchase of motor vehicles...." Accordingly, Riverbend contends that it has obtained a judgment against Swedish "based on an act or omission on which the bond is conditioned" and is therefore entitled to recover against the bond issued by LSC.

LSC argues that all of Swedish's valid bank drafts were paid and that Swedish merely failed to repay its promissory notes under the floor plan. LSC contends that, because the bank drafts were paid, the conditions precedent to Riverbend's collection of the bond amount have not been met. LSC further contends that the bonding statute is only intended to protect persons who sell cars to or purchase cars from licensed car dealers; the statute does not protect lenders when car dealers default on their floor plan financing arrangements.

To determine which line of reasoning is correct, we must construe the meaning of the phrase "payment by the applicant of all valid bank drafts ... drawn by the applicant to buy motor vehicles" in section 503.033(b).

In construing a statute, our primary objective is to ascertain and give effect to the legislature's intent. *See Mitchell Energy Corp. v. Ashworth,* 943 S.W.2d 436, 438 (Tex.1997) (orig.proceeding); *Holmans v. Transource Polymers, Inc.,* 914 S.W.2d 189, 191 (Tex.App.—Fort Worth 1995, writ denied). "[A] court generally must seek the intention of the legislature as found in the plain and common meaning of the words and terms used." *Great Am. Ins. Co. v. North Austin Mun. Util. Dist.,* 908 S.W.2d 415, 420 (Tex.1995). However, if a term is connected with and used with reference to a particular trade, the term shall have the meaning given by experts in the particular trade. *See* TEX. GOV'T CODE ANN. § 312.002(b) (Vernon 1988); *Great Am. Ins. Co.,* 908 S.W.2d at 421.

"Bank draft" and "payment" are banking industry terms. *See Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 655 (Tex.1990) (noting that "bank draft" is a banking industry term for a draft drawn by one bank on an account maintained in another bank or financial institution); TEX. BUS. & COM.CODE ANN. § 3.602(a) (Vernon Supp.1998) (defining "payments"); *see also* BLACK'S LAW DICTIONARY 493 (6th ed.1990) (defining "bank draft" as a draft drawn by one bank on another). Thus, we consider the meaning of that phrase as used by "experts in the trade." *Great Am. Ins. Co.,* 908 S.W.2d at 421. In this endeavor, we are guided by the Texas version of the Uniform Commercial Code (the Texas UCC). The Texas UCC statutorily defines many banking terms and was adopted "to simplify, clarify and modernize the law governing commercial transactions." TEX. BUS. & COM.CODE ANN. § 1.102(b)(1) (Vernon 1994). As dis-

cussed below, the Texas UCC clearly defines what a draft is and what constitutes payment of a draft.

The Texas UCC provides that a draft is a type of negotiable instrument. It is an unconditional order to pay the bearer of the draft or an identified person a fixed amount of money on demand or at a definite time. *See* TEX. BUS. & COM.CODE ANN. §§ 3.104(a), (e), 3.109 (Vernon Supp.1998). The "drawer" of a draft is the person who signs or is identified in the draft as ordering payment. *See id.* § 3.103(a)(3). The drawer in this case was Swedish. The "drawee" is the person ordered in the draft to make payment. The "acceptor" is a drawee who has accepted the draft, i.e., agreed to pay it as presented. *See id.* §§ 3.103(a)(1)–(2), 3.409(a). Riverbend was both drawee and acceptor of Swedish's drafts.

Riverbend's president testified that the bank drafts Swedish prepared and provided to the car sellers were valid. Further, there is no evidence that any of the bank drafts Swedish prepared went unpaid. To the contrary, at trial, both LSC and Riverbend agreed that Riverbend paid the sellers of the cars the amounts of the bank drafts.

Riverbend contended at trial, however, that "payment" of the bank drafts was a two-step process: (1) the bank paid the drafts that the sellers presented; and (2) Swedish reimbursed the bank for the amount charged against its line of credit. This position has no legal support.

■ Under Texas banking law, payment occurs when an obligation is satisfied either directly—by the obliged party, or indirectly—"*on behalf of* a party obliged to pay the instrument." TEX. BUS. & COM.CODE ANN. § 3.602(a) (emphasis added). Both methods of payment are equally effective to discharge "the obligation of the party obliged to pay the instrument." Likewise, once a draft is accepted[2] by a bank (e.g., Riverbend), the drawer (e.g., Swedish) is discharged. *See id.* § 3.414(c). Thus, to the extent Riverbend made payment on Swedish's behalf to the

persons entitled to enforce the bank drafts (the car sellers), Swedish paid the *bank drafts. See id.* § 3.602(a). Whether Swedish later paid its *promissory notes* to Riverbend for the amounts charged against its floor plan line of credit had no effect on whether the bank drafts themselves were paid.

We also note that the term "bank draft" is by definition a draft that is paid by a *bank. See Guaranty Fed. Sav. Bank,* 793 S.W.2d at 655; BLACK'S LAW DICTIONARY 493. Riverbend's president also testified that a bank draft is an instrument drawn by the bank against either one of its own accounts or money over which it has the right to draw—in this case, Swedish's floor plan line of credit. This explanation dovetails with the Texas UCC's provision that payment may be fully accomplished *on behalf of* the obliged party. *See* TEX. BUS. & COM.CODE ANN. § 3.602(a). Because a bank draft is by definition one that only a bank pays, physical payment of the bank drafts by Swedish—to either the car sellers or Riverbend—would have been impossible. This is an absurd result that the legislature could not have intended. *See Barshop v. Medina County Underground Water Cons. Dist.,* 925 S.W.2d 618, 629 (Tex. 1996) (holding that courts should not read a statute to create an absurd result, such as an impossible condition); *see also C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 322 n. 5 (Tex.1994) (stating that statutory provision will not be construed to lead to absurd conclusion if provision is subject to another, more reasonable interpretation).

■ In short, the only way Swedish could have "paid" its bank drafts was to have money or credit available so that Riverbend would honor the drafts. Accordingly, we interpret the term "payment of valid bank drafts" in section 503.033 to mean bank drafts for which a car dealer has sufficient funds at its disposal so that the drawee bank will honor them. *Cf. Lawyers Sur. Corp. v. Royal Chevrolet, Inc.,* 847 S.W.2d 624, 626–27 (Tex.App.—Texarkana 1993, writ denied) (holding that car dealer who purchased cars from car wholesaler with checks returned for

---

2. A bank accepts a draft when it agrees to pay it as presented. *See* TEX. BUS. & COM.CODE ANN. § 3.409.

insufficient funds did not "pay" valid bank drafts under predecessor statute to section 503.033). Any other interpretation, when considered within the context of the bonding statute, the definitions of "bank draft" and "payment," and Texas banking law, would not make sense.

Conversely, if Riverbend had not honored the bank drafts that Swedish provided the car sellers, *Swedish* would have been liable for the unpaid drafts in the same way that a person who writes a hot check is liable for the check amount. *See id.* at 627; TEX. TRANSP. CODE ANN. § 503.033(b)(2). This is because only the car sellers were entitled to enforce the bank drafts against Swedish. There is no evidence that Riverbend was ever entitled to enforce payment of the bank drafts themselves. As Riverbend's president testified, Riverbend could not honor the bank drafts unless Swedish approved payment, even if Swedish's line of credit was sufficient to cover the draft amounts.

The record shows that the only instruments Riverbend was entitled to enforce against Swedish were the promissory notes covering Swedish's floor plan line of credit. A "note" and a "draft" are not interchangeable legal equivalents; they are two different types of negotiable instruments. A note is a written *promise* to pay money signed by the person undertaking that promise. *See* TEX. BUS. & COM.CODE ANN. §§ 3.103(a)(9), 3.104(a), (e). A draft is a written *order* to pay money signed by the person giving the instruction. *See id.* §§ 3.103(a)(6), 3.104(e). Riverbend enforced the promissory notes against Swedish in the first lawsuit.

Because the record shows that the bank drafts were paid through Swedish's line of credit, Swedish paid all valid bank drafts drawn by it on Riverbend. Further, because Swedish's floor plan financing arrangement with Riverbend only consisted of promissory notes and did not include any bank drafts, we hold that the bond did not cover Swedish's default on the floor plan arrangement. Therefore, we hold that Swedish did not violate a condition of the surety bond.

## IV. PRESERVATION OF ERROR

Riverbend contends that we cannot consider whether Swedish failed to pay all valid bank drafts because LSC is attacking this finding in the agreed judgment for the first time on appeal. This argument is without merit. The record shows that LSC repeatedly attacked the validity of this finding in the trial court during the second lawsuit.

## V. NOTICE

Riverbend also asserts that we cannot consider whether Swedish actually violated a condition of the bond because the agreed judgment recites that a violation occurred ("Swedish ... failed to pay valid bank drafts"). Riverbend contends that it is absolutely entitled to recover against the bond simply by proving that it obtained the agreed judgment against Swedish reciting that Swedish had violated a bond condition. Nonetheless, we *can* consider whether the agreed judgment altered the bond terms without LSC's consent, and to do this we must review the evidence of the alleged bond violation.

 The liability of a surety is determined by the language of the bond itself. A statute mandating a bond, such as section 503.033, is made a part of the bond and is controlling. *See Geters v. Eagle Ins. Co.,* 834 S.W.2d 49, 50 (Tex.1992); *Howze v. Surety Corp. of America,* 584 S.W.2d 263, 266 (Tex. 1979). Further, a surety's liability cannot be altered by an agreement between the principal and a creditor absent the surety's consent. *See Fidelity and Deposit Co. v. Caldwell Livestock Comm. Co.,* 698 S.W.2d 375, 377 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.); *see also Vastine v. Bank of Dallas,* 808 S.W.2d 463, 464–65 (Tex.1991) ("Guarantors and sureties are bound only by the precise terms of the contract they have secured and are not obligated to watch over the contracting parties to see that performance conforms to the terms of the contract.... [Thus,] sureties are released from liability when there is a material alteration in, and deviation from, the terms of the contract without the surety's consent and to its prejudice.").

In this case, the agreed judgment's recitation that Swedish failed to pay all valid bank drafts alters the terms of Swedish's bond with LSC. As we have discussed at length, Swedish did not fail to pay any valid bank drafts; Swedish merely failed to pay its promissory notes to Riverbend. Because the agreed judgment altered the terms of the surety bond between LSC and Swedish, Swedish and Riverbend were required to give LSC notice before agreeing to the judgment. Because Swedish and Riverbend did not give LSC the requisite notice, LSC is not bound by the agreed judgment.

Riverbend relies on *Howze* as support for its position that the agreed judgment is absolutely enforceable despite the lack of notice to LSC. In *Howze* the Texas Supreme Court held that, once a judgment is obtained against the principal on a judgment bond, the surety is bound by the judgment absent proof of fraud or collusion. *See Howze*, 584 S.W.2d at 265–66. A judgment bond is one in which the surety agrees to be liable for a judgment based on a specific statutory violation covered by the bond. The surety is bound by the judgment even though it did not receive notice of the alleged violation or the lawsuit that resulted in the judgment. *See id.*

But *Howze* is inapposite here. Unlike the situation in this case, the judgment enforced in *Howze* did not alter the terms of the statutory bond. The parties seeking to enforce the judgment against the bond were specifically covered by the bond and the bonding statute, and the acts on which the judgment was based were specifically covered by the bond. *See id.* at 264–66. Thus, the Texas Supreme Court held that the judgment against the principal—a mobile home dealer—was enforceable against the surety bond, even though the surety did not receive notice of the underlying lawsuit. *See id.* at 265–66. Notably, *Howze* does *not* preclude a reviewing court from determining whether an underlying judgment altered the terms of a statutory judgment bond.

Also, entering into an agreed judgment that alters the terms of a statutory judgment bond without the surety's consent is a type of fraud or collusion by the principal and credi-

tor. The surety on a judgment bond is not entitled to notice of the alleged violation or the underlying proceedings. By entering into such an agreed judgment, the principal and creditor can render a surety absolutely liable on a judgment bond even though the principal never violated a condition of the bond. This is what Riverbend attempts to do in this case; therefore, LSC is not bound by the agreed judgment. *See Howze*, 584 S.W.2d at 266 (holding that surety is not bound when judgment was obtained by fraud or collusion).

## VI. CONCLUSION

Because Swedish paid all valid bank drafts it drew on Riverbend, because Swedish's nonpayment of the promissory notes covering its floor plan line of credit was not covered by the surety bond, and because the agreed judgment altered the terms of the bond without notice to LSC, we sustain LSC's second and third issues. In light of our holdings with regard to these issues, we need not consider LSC's first issue, and we overrule Riverbend's issue that it is entitled to attorney's fees. We reverse the trial court's judgment and render judgment that Riverbend take nothing from LSC.